# CHARLESTON.

## STATE v. HICKS *et al.*

### Submitted February 2, 1915. Decided June 8, 1915.

1. BOUNDARIES—*Indefinite Description—Mistake in Call.*

   In construing a general and indefinite description of land contained in a deed, a call therein plainly appearing to be a mistaken one, from its irreconcilability with another call, with the intention of the parties as viewed from the situation and circumstances surrounding them when the deed was made, and with the acts of the parties under the deed, may be wholly rejected. (p. 510).

2. SAME—*Indefinite Description—Statement of Acreage.*

   Where a description in a deed is indefinite and uncertain as applied to the ground, by reason of conflicting calls or otherwise, the statement of the acreage called for may become an essential part of the description. (p. 514).

Appeal from Circuit Court, McDowell County.

Suit by the State against J. W. Hicks and others. From decree for the State, defendant W. F. Harman appeals.

*Reversed, and remanded, with directions.*

*Chapman & Gillespie, Sanders & Crockett,* and *S. M. B. Coulling,* for appellant.

*W. B. Kegley* and *Anderson, Strother & Hughes,* for the State.

ROBINSON, PRESIDENT:

This suit by the State to sell lands as forfeited, involved, among several tracts, two tracts of land which are the subject of the decree appealed from. One of the tracts was reputed to contain one hundred acres, the other forty acres. The Virginia-Pocahontas Coal Company claimed title to the first

and denied that it was forfeited and liable to be sold for the benefit of the school fund. Harman, however, asserted that he was owner of a one-half interest in the first and of the whole interest in the other, and prayed that he be permitted to redeem both of the tracts. He claimed that the two tracts adjoined each other and were distinct from each other. The coal company not only denied his title to any interest in the one hundred acre tract, but claimed that nearly all of the forty acre tract was overlapped by and included in the bounds of the other. If there was such overlap, and title to the one hundred acre tract was not forfeited, the forfeited title to the forty acre tract so far as it was overlapped of course gave way to the former.

On the hearing of the cause upon the report of a commissioner, together with the testimony taken and the documents filed before him, the court decreed that the one hundred acre tract was not forfeited, and dismissed the same from the suit. It further decreed that the greater part of the forty acre tract was included within the boundaries of the other tract, and therefore denied to Harman the right to redeem any of the forty acre tract except a small portion ascertained to be outside of the boundaries of the other tract. Having found the one hundred acre tract not forfeited, the court found it unnecessary to say who owned the tract with right to redeem. It was necessary, however, to determine the boundaries of the same, so as to find what part of the forfeited forty acre tract Harman was entitled to redeem.

Harman can not complain of the decree wherein it dismisses the one hundred acre tract in which he claimed to own a one-half interest, and the State does not complain. But wherein the decree extends the boundary of that tract so as to include the greater part of the forty acre tract, he is affected and has appealed. For, out of the issue of forfeiture or no forfeiture, his claim of sole ownership in the larger part of the forty acre tract has been adjudged against him. So the case presents a question of location of boundaries. Incidental to Harman's prayer to redeem the forty acre tract which is admittedly forfeited, the question whether the boundary is overlapped by the other one must be decided.

Before proceeding further, it is well to state that the one

hundred acre tract is the same that was involved in *Caretta Railway Co.* v. *Fisher et al.*, 74 W. Va. 115. In that case it was adjudged that the one hundred acre tract was forfeited, but that Harman owned a one-half interest therein, subject to the forfeiture. Now, if his co-tenant, the Virginia-Pocahontas Coal Company, may prevail in spreading the one hundred acre tract largely over the forty acre tract, his claim of sole ownership of the latter is virtually reduced to a one-half interest in that tract also.

We are of opinion that the court erred in determining that the boundaries of the one hundred acre tract extended to any part of the forty acre tract. Only by giving force to that which is evidently a mistaken call in the deed could such extension be made. But the acceptance of that call is certainly at variance with the intention of the parties to the conveyance, not only as that intention may reasonably be inferred from the description of the deed when applied to an actual survey of the ground, but from the situation and circumstances surrounding the parties when the deed was made and their practical exposition of the meaning of the deed by acts under it. The call is so irreconcilable and incongruous with the very next call in the deed, with the intention of the parties as viewed from their general situation and the circumstances surrounding them when the conveyance was made, and with the acts of the parties under the deed after it was made, that it must be wholly rejected. *Matheny* v. *Allen*, 63 W. Va. 443; 5 Cyc. 916; 2 Devlin on Deeds (3rd ed.) sec. 1013d; Tyler on Boundaries, 124.

The one hundred acre tract was conveyed by Preston Beavers to Mary and Sarah Jane Farley, on February 4, 1880. The land lay in a remote and mountainous section, at that time undeveloped and without accurate methods of land transfers. The description given is most general. Yet it is only similar to those then generally employed in an undeveloped section of the country. It is by no means unusual for such a description to be incomplete or mistaken. Not being taken from actual survey, but only from the general knowledge of the parties as to the situation of the land, such description can not be expected always to afford accurate or even consistent boundaries. In the crude way of transferring

land by calls for hollows, spurs, branches, lines of old surveys, and the like, there was probability of some one being mistaken in his recollection of just how things actually lay on the ground. Errors and inconsistencies could readily creep in. Remoteness, land values, habits and education of the people, and other things, did not tend to promote accuracy.

The description in the deed referred to is as follows: "All that certain tract or parcel of land situated lying and being in said County and on the waters of Barrenshe Creek, bounded and described as follows, viz: Beginning at the school house running down the Creek to the Mouth of the mill hollow running up the mill hollow to the original line of a survey said Beavers purchased of Peery et al and with said line crossing the lick branch to the top of the fork spur and down said spur to the creek about 250 yds. below the mouth of Laurel Creek crossing *crossing* same and *strait* up the hill to the original line of said survey and with same to above the school house and down the hill to the beginning containing 100 acres be the same more or less."

We recognize that it will be impossible so to delineate the lay of the land as to make what we may say in construing the description wholly intelligible to readers other than counsel in this case. That could only be done by an exposition of the map from which we write. Between the lines of this opinion, as it were, is that map. Yet its exposition in the reports is impracticable.

The call "running up the mill hollow to the original line of a survey said Beavers purchased of Peery et al", is totally inconsistent and incongruous. No line of the survey which Beavers purchased from Peery and others can be reached by running up the Mill Hollow. To run up that hollow no line of the survey will ever be reached, or even approached. Yet there is no controversy as to the lines of the survey purchased by Beavers from Peery and others. A line thereof is not far from the mouth of Mill Hollow, but by actual survey crosses Barrenshe creek before it reaches the mouth of the hollow. No other lines of the survey referred to have any relation to Mill Hollow. It is this line which does have relation to the hollow that was evidently meant in the description.

Doubtless it was supposed that this line crossed the hollow and then crossed Barrenshe Creek below the mouth of the hollow, instead of above the same as now shown by recent survey. If this line of the survey so crossed the hollow, the call for running up the hollow to it would be the place. It is plain that the party giving the description must have believed that a line of the survey crossed the hollow or came to it; for the description purports that a line of the survey can be reached by running up the hollow. It appears now that none can be so reached, but that to go up the hollow is to go farther and farther from any line of the survey, leaving a body of land that the grantor concededly did not own between lines of the survey called for and the hollow. It is this method of inclusion that has been appealed to for the taking in of the forty acre tract. The commissioner and the court have said that the hollow must be adhered to to its very head, and then a straight line for a long distance to the north supplied to reach a line of the survey that could never in reason have been deemed to have had relation to Mill Hollow. This method itself recognizes a mistake in the description—the leaving out of a call or line. Is it not more reasonable to assume that the call for running up Mill Hollow to a line of the survey is the mistaken one, since no line of the survey can be found in Mill Hollow, than to adhere to the call and never reach the place called for by it? The description tells us to go from the mouth of Mill Hollow to a line of the survey; it does not tell us to go to the head of the hollow and supply a long line to the north to reach a line of the survey. To reach any line of the survey by a line from the mouth of Mill Hollow, we are compelled to disregard the call for running up the hollow. But the description says we shall go from the mouth to a line of the survey. What line? Plainly one that had relation to the hollow, one that was thought of because of its relation to the same. That line of the survey can in reason be none other than the one which by the recent survey crosses Barrenshe Creek above the mouth of the hollow. True, to reach it we must disregard the call for running up the hollow, but even by doing this we more reasonably conform to the general intention of the parties expressed in the deed than to go wandering far from any line of the

survey. The certainty of that call loses its weight when it is found to be false by not leading to what it purports to lead to. It is at most a general and indefinite call indicating direction or course to the well established line of the survey intended to be reached directly by a line from the mouth of the hollow. The call for the line of the survey is locative and paramount to any direction given for reaching it.

The line of the survey, called for as being reachable from the mouth of Mill Hollow, we are told by the description is one that will cross Lick Branch. Disregarding the mistaken call for running up the hollow, and starting for the only line of the survey that has any relation to Mill Hollow, we shortly reach that line. This line continued with other lines of the survey crosses Lick Branch. It is said, however, that the description says "line" and not "lines". But this seems a small inconsistency in comparison to what those who call our attention to it would have us do; that is, to go up the hollow and never reach any line of the survey that even connects with one approaching or crossing Lick Branch. It seems more consistent with the general intention of the parties, apparent from the survey map of the territory, to go from the mouth of the hollow to the only line of the survey having relation to the hollow and then follow established lines of the survey to a crossing of Lick Branch, than to go up the hollow farther and farther from any line of the survey and then supply one long line so as to reach the line of survey at a point most remote from the hollow but just in place to cross Lick Branch. It is clearly apparent that the parties meant to reach the survey directly from the mouth of the hollow and to be guided by that survey to a point beyond Lick Branch. We can not believe that they meant to go wandering in the mountains, far from the survey which they plainly indicated must be reached from the mouth of Mill Hollow.

The situation and circumstances surrounding the grantor at the time of the conveyance negative any intention to convey any such boundary as would be included by running up the hollow to its head and supplying the long line to the north. It must be conceded that he did not own that which is thus taken in from outside the Peery survey. It is to be assumed that he meant to act fairly with the grantees and to convey

only land which belonged to him. In the absence of plain intent to do otherwise, we can not impute dishonesty to him in the conveyance of land beyond his actual bounds. That he was only endeavoring to convey from what had been conveyed to him by Peery and others is clear, from his situation as a land owner at the time. Indeed the description in his deed, mistaken though it is, indicates the same thing, when compared with the survey map before us.

Further, there were subsequent acts of the parties in living under the deed, which put a practical construction on its meaning as to the boundary conveyed. From acts of both the grantor and the grantees under it, we must know that they never understood it as conveying a boundary that included land south of the Peery survey mentioned in it. The grantor, soon after making the conveyance, bought from Sayers land extending over Mill Hollow. Would he have dealt with an adverse claimant if he had theretofore claimed to own land on all one side of the hollow to its head, and had conveyed the same to others with warranty of title? Moreover, it appears that Madison Farley, the husband and father of the grantees in the deed from Beavers, in two years after the conveyance purchased the forty acres from Sayers and took title thereto in the name of another infant daughter, Matilda. The deed from Sayers describes the forty acre tract as adjoining the lands which Mary and Sarah Jane Farley had bought from Beavers. The Farleys were all living together as a family on the Beavers tract. The forty acre tract lay opposite their front door. Would Madison, the husband and father, acting for the family, have bought for one infant daughter land understood to be in the bounds of that already owned by his wife and another infant daughter? For Mary and Sarah Jane Farley, the grantees of Beavers, he understood and accepted the lines of the Beavers deed as we have construed the description therein. And conveyances afterwards made by Mary and Sarah Jane Farley show that they understood the description not to include the forty acre tract.

Indicative also that Beavers, the grantor, did not mean to include land between the hollow and the Peery survey, is the matter of acreage. His deed calls for reasonable approximation to one hundred acres. That amount is found within the

survey from which we perceive he only meant to convey. To include the outside boundary is to increase the acreage called for in the deed more than fifty per cent. ''Where the description of land by monuments, distances or otherwise is vague and indefinite, by reason of conflicting lines or omission of a line, or from any other cause, the statement of the acreage is an essential part of the description.'' *Smith* v. *Owens,* 63 W. Va. 60.

The forty acre tract is distinct and separate from the land which Beavers conveyed to Mary and Sarah Jane Farley. This smaller tract, now owned by Harman through conveyances from Matilda Farley, is not within the bounds of the one hundred acre tract, and Harman is entitled to redeem it.

It is submitted that the forty acre tract, even if not included within the bounds of the other tract, is now owned by the Virginia-Pocahontas Coal Company through a tax deed based on a delinquent sale in the name of Elizabeth Farley. That tax deed purports not to convey the forty acre tract, but an undivided third interst in the one hundred acre tract. Besides, it is totally void. We so held in *Caretta Railway Co.* v. *Fisher et al., supra.*

Wherein the decree adjudges the boundaries of the one hundred acre tract to be indicated on the Rawie map by the letters K L M I X R W N O F K and denies to Harman redemption of the forty acre tract as indicated on the map by the letters J G C D T S Q J, it will be reversed, and such decree as the circuit court should have entered in the premises will now here be made. That decree will be that the one hundred acre tract conveyed by Preston Beavers to Mary and Sarah Jane Farley, on February 4, 1880, includes none of the land indicated on the map by the letters J G C D T S Q J, and that Harman may redeem the latter upon the payment of the taxes and dues properly chargeable against the same. And the cause will be remanded with direction to ascertain the amount he should pay and to decree a redemption of the land in his favor when he shall have paid the amount necessary thereto.

*Reversed, and remanded, with directions.*