UNITED THACKER COAL CO. v. RED JACKET, JR., COAL CO. et al.*

(Circuit Court of Appeals, Fourth Circuit.    March 4, 1916.)

No. 1403.

1. BOUNDARIES ⬤1—DISPUTED BOUNDARIES—LOCATION—CONFLICTING CALLS.
It is the duty of the court in case of conflicting calls to reconcile them, if possible, to establish the true location of the lands in controversy; and where the lands were granted by the state as containing a specified number of acres, the intention of the state to convey such acreage should be considered.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. § 1; Dec. Dig. ⬤1.]

2. BOUNDARIES ⬤3(3)—MONUMENTS—COURSES AND DISTANCES.
A call for a monument will control a call for courses and distances.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 6–19; Dec. Dig. ⬤3(3).]

3. BOUNDARIES ⬤37(2)—DISPUTED BOUNDARIES—ACTIONS—EVIDENCE.
In a disputed boundary case, evidence held insufficient to show that a call for a survey of land belonging to a third person was a call for a monument, which would control the courses and distances and give defendants lands afterwards patented to complainant.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 186–189; Dec. Dig. ⬤37(2).]

4. BOUNDARIES ⬤9—DISPUTED BOUNDARIES—ACREAGE.
Where the calls for grants of land were confused, the acreage is an important factor.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 77–89; Dec. Dig. ⬤9.]

5. DEEDS ⬤90—PUBLIC LANDS ⬤186—CONSTRUCTION—GRANTS.
While a grant in case of individuals will be construed against the grantor, the rule is otherwise as regards a grant by the state.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 234–237, 247, 248; Dec. Dig. ⬤90; Public Lands, Cent. Dig. § 599; Dec. Dig. ⬤186.]

---

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

232 F.—4                    *Rehearing denied May 9, 1916.

6. BOUNDARIES ☞47(1)—DISPUTED BOUNDARIES—WARNING OF DISPUTE.

That defendants, before plaintiffs purchased the lands in controversy, warned them that they claimed an overlap on such lands, will not defeat complainants' rights, or entitle defendants to their construction of the conveyances, the boundaries being in dispute.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. § 227; Dec. Dig. ☞47(1).]

Appeal from the District Court of the United States for the Southern District of West Virginia, at Charleston; Benjamin F. Keller, Judge.

Bill by the United Thacker Coal Company, a corporation, against the Red Jacket, Jr., Coal Company, a corporation, and others. From decree for defendants, complainant appeals. Reversed and remanded, with directions.

This is an appeal from a decree of the District Court of the United States for the Southern District of West Virginia, entered on the 6th day of February, 1915, in a suit in equity in which the United Thacker Coal Company, a corporation, was complainant, and the Red Jacket, Jr., Coal Company, a corporation, and Richard Torpin, George Wharton Pepper, and Richard H. Harte were defendants. The appellant will hereinafter be referred to as complainant, and the appellees as defendants, such being the respective positions occupied by the parties in the court below.

The complainant, being in the actual possession of the tract of land which it claims, filed its bill to quiet its title against the claims of the trustees and their lessee, the Red Jacket, Jr., Coal Company, to any part of the tract. The bill avers that it is seised in fee simple and in the actual possession of the land in question. It states the grant of the same to the plaintiff by the state of West Virginia; avers that the trustees are claiming to own in fee simple a large part of said tract, containing by estimation about 250 acres; states that the claim of the trustees is derived under the grant of 440⅔ acres to J. D. Sargeant, and that they claim said tract interlocks with said 382½-acre tract; sets out the said mining lease of January 1, 1909, from the trustees to the Red Jacket, Jr., Coal Company, and avers said lessee claims the right under said lease to enter upon and mine the coal in said interlock; states that the trustees caused to be made what they claim to be a survey of said 440⅔-acre tract in such manner as to embrace about 250 acres of said 382½-acre tract, and caused to be marked the lines of such purported survey by painting trees along the same; avers that there is in fact no interlock between said 440⅔ acres and said 382½-acre tract; avers that the claims made by the defendants of the existence of said interlock, their survey of such an interlock by painting the trees on the ground, and their claim of title by the execution of said mining lease have cast a cloud upon the title of the plaintiff; and avers that said land is valuable alone for its coal and timber. The prayer of the bill is that the plaintiff be decreed to have title to its said tract of 382½ acres and be quieted in the possession thereof.

The trustees and the Red Jacket, Jr., Coal Company united in the answer filed to the bill. In paragraph 5 of the answer a motion is made to dismiss the bill for want of jurisdiction, and in paragraph 6 an alternative motion was made to transfer the cause to the law side of the court, if the motion to dismiss should be overruled. The defendants filed their joint and several answer, wherein they admitted the pendency of the suit of the state of West Virginia against the unknown heirs of John Green et al., the decree of sale therein on the 23d day of February, 1912, the sale thereunder and the purchase of the land in question by the complainant, the confirmation thereof by decree of April 20, 1912, and the conveyance pursuant thereto by S. B. Robertson, commissioner, to the complainant, but denied that the state of West Virginia had any authority, power, or jurisdiction to sell said land so claimed by the complainant, because she had at a former date and in a like proceed-

ing parted with all her right, title, and interest therein to one J. D. Sargeant, from and through whom the trustee defendants had acquired title thereto, and were still the owners thereof.

The owner alleged that on the 3d day of July, 1888, in a certain proceeding then pending in the circuit court of Logan county (of which Mingo county was then a part), having for its object the sale of certain lands for the benefit of the school fund, a decree was entered directing the commissioner of school lands to sell a tract of 440⅔ acres of land situate on Mate and Pigeon creeks; that, pursuant to said decree of sale, one L. D. Chambers, then the commissioner of school lands for Logan county, on the 2d of October, 1888, sold said land, and J. D. Sargeant became the purchaser thereof; that afterwards— that is to say, on the 3d day of October, 1888—a decree was entered in said cause confirming the sale so made to J. D. Sargeant, and directing the commissioner of school lands to execute to Sargeant a deed therefor by metes and bounds, conveying all the right, title, and interest of the state in and to said tract of land; that subsequently, and pursuant to said decree of confirmation, the said L. D. Chambers, commissioner of school lands as aforesaid, did, on the 5th day of October, 1888, grant said land by metes and bounds unto the said J. D. Sargeant by deed regularly executed, delivered, and recorded, and that the said Sargeant subsequently conveyed said land to Richard Torpin et al., trustees, which said trustees, by subsequent conveyances, transferred to the present trustees, who are now vested with the title to said land and are the owners thereof; and that they were the owners of said land at the time of the decree of sale entered on the 23d day of February, 1912, in the suit of the state of West Virginia against the unknown heirs of John Green et al., as well as on the 20th day of April, 1912, when the decree of confirmation was entered in said suit, and also upon the 2d day of May, 1912, when S. B. Robertson, commissioner of school lands, conveyed said 382½-acre tract unto the plaintiff.

The owner further alleged that the complainant, the United Thacker Coal Company, which purchased under the decree of February 23, 1912, its agent and attorney, Edward C. Lyon, the special commissioner making the sale, and the commissioner of school lands, S. B. Robertson, who conveyed the same unto the complainant, one and all knew that the state of West Virginia had theretofore sold said land, and that the same, or so much thereof as conflicted or interlocked with the land now claimed by the complainant, had been regularly conveyed by L. D. Chambers, commissioner of school lands of the county of Logan, unto the said Sargeant, and that the title so vested in him had been transferred to the trustee defendants in this cause, and notice of said prior sale and the present ownership of the land in question was given by the trustee defendants to the said court commissioner, the commissioner of school lands, the United Thacker Coal Company, and its agents, on the day of sale under the decree of February 23, 1912, and before said sale was made, and that the United Thacker Coal Company purchased said land with full knowledge of the claim and ownership of the defendant trustees.

The defendants further answered that they had entered upon said lands and caused the same to be surveyed, and had leased the same to their codefendant, the Red Jacket, Jr., Coal Company, and that they had leased the same to said company in conjunction with another and adjoining tract of land, upon which the Red Jacket, Jr., Coal Company had already entered and was mining coal, and that said Red Jacket, Jr., Coal Company, by virtue of said lease, has the right to mine and remove all the coal from the land in controversy.

A general replication was entered, and evidence, both oral and documentary, was introduced. The regularity of the proceedings by the state in both cases leading to the school land commissioner's deed, in the one case to the complainant, and in the other to the defendants, was admitted, and the location of the tract of land claimed by the defendants and described in the deed of October 5, 1888, from Chambers, school land commissioner, to J. D. Sargeant, became the sole issue.

The court below located the land of the defendants embraced in the Sargeant deed as contended for by the defendants, and entered a decree declaring

that the complainant had no title to or interest in any portion of the 440⅔-acre tract of land claimed by the trustee defendants, except a small portion thereof where the line of the Chambers deed crosses the Pat Hatfield tract, claimed by plaintiff under another and undisputed title, which portion was excepted in the decree by metes and bounds.

While, among other things, it is stated in the motion to transfer the case to the law side of the court that the bill does not show the plaintiff to be in possession of the land in controversy, yet there is no denial in the answer to the allegation in the bill that the complainant is in the actual possession of the 382½-acre tract.

Malcolm Jackson, of Charleston, W. Va., and C. W. Campbell, of Huntington, W. Va. (Edward C. Lyon, of New York City, Brown, Jackson & Knight, of Charleston, W. Va., and Campbell, Brown & Davis, of Huntington, W. Va., on the brief), for appellant.

John H. Holt, of Huntington, W. Va. (E. L. Greever, of Tazewell, Va., Maurice G. Belknap, of Philadelphia, Pa., Greever, Gillespie & Divine, of Welch, W. Va., and Holt, Duncan & Holt, of Huntington, W. Va., on the brief), for appellees.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). At the trial the complainant introduced the original survey and plat of the 440⅔-acre tract, which are referred to and made a part of the grant of this tract from Chambers, commissioner, to J. D. Sargeant. This survey commenced at the white oak corner of the Preston Smith survey, and thence runs with three lines of that survey; then runs eight independent lines until it reaches the Richard Tiller survey; thence with that survey until it calls for "a stake on the line of a survey made for Ephraim Hatfield"; thence runs with one line of the Hatfield survey south 65° west 118 poles to a sugar tree; thence south 89° east 396 poles to the beginning. One of the Tiller corners called for is a "double lynn," being the corner from which the next call is "north 40° west 55 poles to a stake on a line of survey made for Ephraim Hatfield." By stipulation it was agreed that there was no controversy as to the location of the beginning corner, and none as to the location of the line for the beginning corner to around the double lynn corner.

Therefore the controversy as to the location of this tract begins at the double lynn corner. It was shown by the defendants that no survey made for Ephraim Hatfield could be reached by running from the double lynn on the bearing of north 40° west. This testimony is not controverted by the complainant. The defendants, therefore, insisted that the call "north 40° west 55 poles" should be rejected as a mistake; that the quadrant should be changed and the call made to read south 40° west, and the distance extended until it reached the Ephraim Hatfield survey of 215 acres. To adopt this contention would increase the distance from 55 poles to about 255 poles.

It is also insisted that the call to run with the Ephraim Hatfield survey "south 65° west 118 poles to a sugar tree" should be likewise treated as a mistake, and that after reaching the Ephraim Hatfield survey of 215 acres the line should run with this survey south 65° east 118 poles to a point, and thence to the beginning corner. It was shown

that there were a number of Ephraim Hatfield surveys in the vicinity of this tract, and also that the Ephraim Hatfield 304-acre survey had a line 65° west to a sugar tree. The complainant insisted that the Ephraim Hatfield 215-acre tract was not a monument call for any survey of this tract, and that there was nothing to change the calls and distances so as to reach and run with the Hatfield survey; that the line from the double lynn should continue to run with the Tiller survey "north 40° west 55 poles" as called for; that the next line should be south 65° west 118 poles as called for, and thence to the beginning corner. If this contention be correct it would locate the closing line of the 440⅔-acre survey in exact accordance with its location as shown in the grant to the plaintiff of the 381⅔-acre tract.

Maps were used by both parties at the trial which show the location of the Ephraim Hatfield 215-acre, 20-acre, 24-acre, and 304-acre surveys; also the Smith 103-acre survey and such lines of the Richard Tiller survey as relate to this controversy. The following map will show the contentions of the respective parties:

This map shows the 440⅔ acres in controversy, the 382½ acres south of and adjoining the 440⅔ acres, and the Ephraim Hatfield 215-acre, Ephraim Hatfield 24, and Ephraim Hatfield 304-acre surveys. The contention of the complainant is indicated by the solid lines around the 440⅔-acre tract. The contention of the defendants as to the location of this tract is indicated by the broken line, commencing at the "double lynn," at the northwest corner of the map, thence by two lines to the beginning. The first fifteen lines from the beginning corner above Horse Road fork to the double lynn corner are not in dispute.

While it appears that more than one survey was made for Ephraim

Hatfield in that community, and also that the calls in the deed from Chambers, commissioner, to Sargeant, do not specify the date of the deed of the Hatfield tract to which reference is made, nor the number of acres contained therein, nevertheless it is insisted by defendant that the testimony offered in their behalf affords a satisfactory explanation as to these points and tends strongly to fix the Ephraim Hatfield 215-acre home place as being the tract which is referred to in the deed from Chambers, commissioner, to Sargeant.

The defendants further insist that they have shown by the register of the land office of Virginia that prior to the separation of the state of West Virginia from Virginia only seven tracts had been granted to Ephraim Hatfield by the state of Virginia, to wit: 84 acres on Beech creek; 45 acres on Camp fork of Mate creek; 215 acres on Beech creek; 24 acres on Straight fork of Mate creek; 125 acres on waters of Mate creek; 215 acres on Mate creek; 70 acres on water of Mate creek. It was also shown by the witness Mannakee, a civil and mining engineer, that the 84 acres on Beech creek "was approximately three miles from the double lynn"; that the 45 acres on Camp fork of Mate creek "lies across the latter creek, from and to the south of the land in controversy"; that Murphy's branch, called for in the Ephraim Hatfield patent for 70 acres, "is in a southwesterly direction from the land in controversy, and about two miles distant"; that Meadow branch, referred to in the 125-acre patent to Ephraim Hatfield, "is southeast of the land in controversy and across Mate creek." This, according to defendants' contention, leaves only the 20 (not shown on the foregoing map), 24, and 215 acre tracts, which, by stipulation, were properly located on defendants' trial map, and from which it appears that the location of the 20 and 24 acre tracts is such that neither of them could be treated as the Hatfield survey mentioned in the Chambers deed, and therefore defendants insist that there is but one survey left, to wit, the 215–acre tract.

It is further insisted on behalf of defendants that the foregoing are the only surveys made for Hatfield prior to the separation of West Virginia from Virginia, except a 304-acre tract, which was never carried into grant; that the testimony of James French Strother covered all surveys and deeds made to Ephraim Hatfield for lands in the county of Logan, West Virginia, prior to the deed of Chambers, commissioner, to Sargeant; that his testimony shows surveys to Ephraim Hatfield for four other tracts, one being for 304 acres, which by stipulation between counsel is properly located on defendants' trial map, and it is insisted that the lands in controversy could not be located by adopting this tract as the monument called for; that one tract by Chambers, commissioner, to Ephraim Hatfield, containing 114 acres situate on Beech creek, which, according to the evidence of witness Mannakee, is not even a tributary of Mate creek, and is three miles distant from the double lynn, and two other tracts, one conveyed by Floyd Hatfield to Ephraim Hatfield, containing 50 acres, and one by Ephraim Hatfield, son of Wall Hatfield, containing 25 acres, are situated on Double Camp branch, which, according to the testimony of Mannakee, is across Mate creek and south of the lands in controversy; and that, therefore,

these tracts could not be employed for the purpose of locating the line in dispute.

It is therefore contended by the defendants that the Ephraim Hatfield 215-acre tract is the only one that can be properly located as the tract called for in the deed from Chambers, commissioner, to Sargeant; that this is the only survey made for Ephraim Hatfield to which the line from the double lynn could be run, so as to use all the calls in the Chambers deed and close the survey; that to run the Chambers deed as plaintiff contends no Ephraim Hatfield survey could be reached, and no running with any line thereof for 118 poles, as required by the next to the last call in the Chambers deed, is done, while, on the other hand, when the survey is made as contended by the defendants, changing the quadrant from the double lynn, the Hatfield survey is reached, and the next call thereafter of 118 poles along one of its lines is met and the line is closed, so as to meet the calls contained in the Sargeant deed.

It is admitted that by adhering strictly to the calls of its deed it would be impossible to locate the defendants' tract. That the surveyor was mistaken as to the course and distance of the lines that were obviously made by projection is shown by an examination of the plat as well as the map made by him at the time the land was conveyed by the state. Many of the calls, if taken literally, could not be employed so as to locate with anything like certainty the 440⅔-acre tract. This is due, no doubt, to a misconception of the surveyor as to the location of the adjacent tracts. These calls, if literally followed, could never be run so as to connect with the beginning corner.

[1-3] It is well settled that in a case like the one at bar it is the duty of the court, if possible, to reconcile any conflicting calls, so as to establish the true location of the lands in controversy. In view of the facts and circumstances of this case we deem it important to ascertain the intention of the grantor at the time these respective tracts were conveyed. The determination of this point will aid us materially in reaching a correct conclusion as to the true location of the same.

It appears that it was the purpose of the grantor to convey to the defendants and those under whom it claims a tract containing 440⅔-acres, and that it was also its purpose to convey to the complainant and those under whom it claims 382½ acres. It further appears that the state received pay for the number of acres contained in the respective grants. Under these circumstances, it becomes highly important in determining the true location of the lines in dispute to construe the calls of these deeds so as to conform, if possible, to the respective contracts for the sale of the same, and thus effectuate the purpose the grantor had in mind at the time.

It is fair to assume that the surveyor had copies of the respective Hatfield surveys at the time the survey of this tract was prepared. No evidence was offered as to what transpired at the time this survey was made, nor was there any evidence offered to show that the party who made the same ran the lines from the double lynn corner so as to reach the Ephraim Hatfield 215-acre survey. The testimony of the surveyor, chain carriers, or other parties present, would have

aided the court below very much in determining this question, but for some reason these parties were not called to testify, and there is nothing in the record to show why this evidence was not offered.

It also appears from the evidence of the surveyors and engineers who surveyed these tracts that no marks had ever been made on the double lynn as the corner of the 440⅔-acre survey to indicate that a line ran from that corner so as to connect with the Ephraim Hatfield 215-acre tract, and it further appears that after diligent search no evidence could be found of any line leading from the double lynn to the Hatfield survey in question, nor was there any evidence offered for the purpose of showing that a sugar tree had ever stood upon or along the Hatfield 215-acre survey. By an examination of the plat of the 440⅔-acre survey it is apparent that a mistake was made in platting the calls. For instance, the two calls "north 55° west 80 poles to a double lynn," and "north 40° west 55 poles to a stake in the line of a survey made for Ephraim Hatfield," should have been platted northwest instead of southwest.

The following is a map showing the original plat:

PLAINTIFF'S MAP No. 1

This plat shows the connection of the two southwest lines. Thus it appears that if the surveyor had correctly platted the calls of his survey the closing line would have been altogether different. It also appears that the surveyor made other mistakes in copying the Tiller survey, one of which is "north 73½° west 84 to a double chestnut and locust." This was copied in running the line of the 440⅔-acre tract so as to read south 73½° west 180 poles to the double chestnut and

locust," and shows as a southwest line. It is but natural that these mistakes should have misled the surveyor as to where he was, when by protraction he was on the Tiller line north 40° west 55 poles from the double lynn corner, and caused him to believe that he could connect with the south 65° west line of the Ephraim Hatfield 304-acre survey.

As we have stated, the location of this tract depends upon the location of a single line of the call of the survey. Upon the testimony as introduced in the court below it is contended by defendants that (a) "the Hatfield survey, being identified and its lines established, becomes a monument, to which course and distance must yield;" that (b) "in order to reach a monument or the line of another survey called for, the quadrant may not only be changed, but such is the practice in surveying."

In support of these propositions the defendants insist that it is shown by a preponderance of the evidence that the 215-acre Ephraim Hatfield tract was the one the surveyor had in mind at the time he wrote the call contained in the deed from Chambers, commissioner, to Sargeant, and, this tract being identified as the monument called for in the deed, the action of the court below in holding that the quadrant should be changed at the double lynn so as to reach the 215-acre Ephraim Hatfield tract was correct. It is well settled that, "in determining the boundaries of lands, ascertained objects, natural landmarks, and reputed boundaries control mere course and distance." Indeed, this is conceded to be the rule by counsel for the complainant.

However, counsel for complainant insist (a) that, if located as defendants contend, the land in controversy would not lie "on the ridge between Mate creek and Pigeon creek," as described by the surveyor who made the survey upon which the Sargeant deed is based, and (b) that there is no sugar tree corner in the Ephraim Hatfield survey of 215 acres, and that no line in that survey has a bearing of "south 65° west 118 poles to a sugar tree," and that in consequence no such line in that survey can be followed for a distance of 118 poles and bring the surveyor to a sugar tree therein, but that there is such a line in the Ephraim Hatfield survey of 304 acres, and, therefore, it must have been the survey intended; (c) that the true construction of the deed from Chambers commissioner to Sargeant is that the call running from the double lynn "north 40° west 55 poles" continues to run with the Tiller survey, because a few calls back the survey was made to run "with the same," and no indication prior to the call of the double lynn had been given that there was to be any departure therefrom.

From what we have said it will be seen that the one question to be determined is as to whether the 215-acre Hatfield tract is the boundary line or monument called for in the deed to Sargeant. If the evidence offered in the court below established this fact, then that court was justified in entering a decree in accordance with defendants' contention. However, to warrant a finding upon this point in favor of the defendants it must appear by a preponderance of the evidence that the 215-acre tract was the monument called for in the deed in question. In view of the fact that the surveyor failed to give the number of

acres, as well as the date of conveyance, when considered together with the fact that the "call" specified as being in the line with this tract was not found, and the further fact that the call did not terminate at the sugar tree, the adoption of this tract as the monument called for could only be done by conjecture. While, as we have stated, a monument, such as a line or natural object, will control course and distance, this is only true where the monument called for is capable of being definitely located.

In considering this question it should be borne in mind that the surveyor did this work by protraction, and it is admitted that he was mistaken as to many of the calls before he reached the double lynn. If, as insisted by counsel for defendants, the other tracts owned by Ephraim Hatfield are incapable of being located as the one the surveyor had in mind (which is apparently true), except as to the 304-acre tract, even this would not justify the court in adopting the line of the 215-acre tract solely because it happened to be nearer the double lynn than the other tracts. This is especially true inasmuch as this construction of the deed would necessarily result in depriving complainant of 250 acres of land which the school commissioner undertook to convey to it, and at the same time give the defendants 289 acres of land in excess of the amount which the school commissioner undertook to convey to Sargeant.

We are at a loss to know upon what theory this identification of the Ephraim Hatfield survey to which reference is made in the grant can be ignored and an entirely different survey substituted in its place for the purpose of locating this tract. In other words, if on account of the mistake of the surveyor the Tiller survey could not be connected with the Ephraim Hatfield 304-acre survey it could not be reasonably insisted that it should be run to the 215-acre Hatfield survey, with no means of identifying the same other than the fact that it happens to be situated near where the line in dispute begins. Even if it had appeared from the evidence that the surveyor made a mistake in attempting to connect the Tiller survey with the Ephraim Hatfield 304-acre survey, we know of no rule which would justify making a new survey by the adoption of a monument which could be identified as the one called for in the original survey, and this is especially true in view of the fact that there is a line in the 304-acre Hatfield tract which literally fulfills the terms of the only specific declaration as to the particular Hatfield tract which the surveyor had in mind at that time.

Whilst it is true, as contended by the defendants, that the contentions of neither of the parties can be sustained by a literal compliance with the calls of the grant from Chambers, commissioner, to Sargeant, nevertheless it is the duty of the court to adopt that theory which appears to be most reasonable, and at the same time give to each party, as near as may be, the amount of acreage purported to be conveyed in the respective grants.

[4, 5] Where, as in this instance, the calls of a deed are so vague and conflicting as to render it difficult to locate the same definitely, the acreage purported to be conveyed to the respective parties becomes an important, if not controlling, factor to be considered in determining

the true location of the lands in controversy. In the case of Field v. Columbet, 4 Sawy. (U. S. Cir. Ct.) 523, Fed. Cas. No. 4,764, Mr. Justice Field says:

"The designation of quantity, it is true, will not control the boundaries where they are clearly indicated. Yet, where there is doubt as to the true description, it may be properly considered."

Also in the case of Peebles v. Graham, 128 N. C. 227, 39 S. E. 25, the court says:

"The general rule is that the quantity of land stated to be conveyed will not be considered in determining location or boundaries. But there is a well-known exception to this rule that is as firmly established as the rule itself, and that is that, when the location or boundary is doubtful, quantity becomes important."

The Supreme Court of West Virginia, in the case of State v. Hicks, 85 S. E. 665, in referring to this question, said:

"Where the description of land by monuments, distances, or otherwise is vague and indefinite, by reason of conflicting lines, or omission of a line, or from any other cause, the statement of the acreage is an essential part of the description."

In the case of Kirkland v. Way, 3 Rich. (S. C.) 4, 45 Am. Dec. 752, the syllabus is in the following language:

Syl. 2: "Where the other terms of the description, contained in a conveyance of land, are not sufficiently certain and demonstrative, the number of acres is an essential part of the description."

The following West Virginia cases are also very much in point: Smith v. Owens, 63 W. Va. 60, 59 S. E. 762; Lovett v. West Virginia Central Gas Company, 73 W. Va. 40, 79 S. E. 1007.

In further support of complainant's contention it is insisted that in a suit like the one at bar the grant, having been made by the state, should be construed strictly against the grantee. It is the policy of the law in construing a deed as between individuals to construe the same strictly against the grantor, but in a suit like this, where the state is the grantor, the grant is to be construed strictly against the grantee. This policy is based upon the theory that the state is the trustee or guardian of the rights, emoluments, and prerogatives of the people as respects the public domain, the same being conferred upon the state by the people to be exercised and used for their benefit. Therefore, in a grant from the state, the rights and emoluments thus conferred should be safeguarded in construing the calls of the same so as to avoid the possibility of passing title to a greater number of acres than are specified in the grant, and to accomplish this it is the policy of the courts to hold the grantee strictly to the calls contained in the grant.

In the case of Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331, the Supreme Court, among other things, said:

"It was argued for the defendants in error that the question presented was a mere question of construction of a grant bounded by tide water, and would have been the same as it is if the grantor had been a private person. But this is not so. The rule of construction in the case of such a grant

from the sovereign is quite different from that which governs private grants. The familiar rule and its chief foundation were felicitously expressed by Sir William Scott: 'All grants of the crown are to be strictly construed against the grantee, contrary to the usual policy of the law in the consideration of grants; and upon this just ground, that the prerogatives and rights and emoluments of the crown being conferred upon it for great purposes, and for the public use, it shall not be intended that such prerogatives, rights, and emoluments are diminished by any grant, beyond what such grant by necessary and unavoidable construction shall take away.' The Rebeckah, 1 C. Rob. 227, 230. Many judgments of this court are to the same effect. Martin v. Waddell, 16 Pet. 367, 411 [10 L. Ed. 997]; Central Transportation Co. v. Pullman's Car Co., 139 U. S. 24, 49 [11 Sup. Ct. 478, 35 L. Ed. 55]."

In the case of Charles River Bridge v. Warren Bridge et al., 11 Pet. 420, 9 L. Ed. 773, the Supreme Court also said:

"But we are not now left to determine, for the first time, the rules by which public grants are to be construed in this country. The subject has already been considered in this court, and the rule of construction, above stated, fully established. In the case of United States v. Arredondo, 6 Pet. 738 [8 L. Ed. 547], the leading cases upon this subject are collected together by the learned judge who delivered the opinion of the court, and the principle recognized that in grants by the public nothing passes by implication."

To the same effect is the case of Dubuque & Pacific Railroad Company v. Edwin C. Litchfield, 23 How. (64 U. S.) 66, 16 L. Ed. 500.

[6] It is also insisted by defendants that at the time this land was sold to complainant a notice signed by Torpin, Pepper, and Harte, trustees, by counsel, addressed to John W. Mason, Jr., special commissioner, and S. B. Robertson, commissioner of school lands of Logan county, and to all bidders and purchasers, which purported to give warning by stating that the tract of 382½ acres then about to be sold under decree was covered in whole or in part by the 440⅔-acre tract claimed by such trustees, and is the tract involved in this suit.

This notice could not in any way affect the question now before us. It certainly could have no bearing as to the true location of the tract claimed by defendants. These grants must be construed in the light of the calls contained therein, and a notice of this character could be of no value in construing the same.

When we consider the real point in this controversy, in the light of the facts and circumstances, and apply the rules of construction as announced by the courts, we are impelled to the conclusion that the court below erred in construing the calls of defendants' deed, and that the calls of the same should be construed so as to conform to the contention of the complainant as indicated on the map that is made a part of this opinion. As a result of this conclusion the acreage proposed to be conveyed to the respective parties is increased, rather than diminished, thus resulting, as we think, in no injustice to either party.

For the reasons stated, the decree of the court below is reversed, and the cause will be remanded for further proceedings in accordance with the views herein expressed.

Reversed.